LOTTINGER, Judge.
This and the companion case entitled Cortez v. Donner et al., La.App., 172 So.2d 127 were consolidated for trial and were disposed of by the Lower Court as follows:
“The plaintiffs filed these suits for personal injuries received in an automobile accident that occurred on or about November 25, 1958 on U. S. Highway 90, approximately five miles west of the Huey Long Bridge across the Mississippi River. The plaintiffs were traveling west on U. S. Highway 90 in a 1958 Ford 4-Door, owned and operated by plaintiff Arthur A. Hebert. Plaintiff Lionel J. Cortez was riding in the front right hand seat of the Hebert vehicle. The collision occurred with a 1956 Chevrolet being driven by the defendant, Mrs. Hazel Donner. The *122 Donner vehicle was occupied by Mrs. Donner, her daughter in law Carol and son Gene, and a male companion, Dominic Lamartina. Mr. Hebert and Mr. Cortez were the only occupants of the Hebert vehicle.
“The Donner vehicle had been parked at Kent’s Restaurant, which was located on the south side of U. S. 90. Mrs. Donner and her occupants had left Kent’s Place to return to their home in Thibodaux, and the collision occurred shortly thereafter.
“Plaintiff Hebert contends that the Donner vehicle pulled directly, suddenly, and unexpectedly into the path of his vehicle. Plaintiff Cortez has taken the position that both Mrs. Donner and Mr. Plebert were negligent, and has made both drivers along with their insurance companies defendants in his petition.
“Mrs. Donner’s insurance company, The Aetna Casualty and Surety Company, is a defendant in both proceedings, and Mr. I-Iebert’s insurance company, The Travelers Insurance Company, is a defendant in the suit brought by Mr. Cortez.
“The record shows quite clearly that U. S. Highway 90 in the general area of the accident is a hard-surfaced, four-lane road separated by a neutral ground. The general scene can be seen in Donner 23, which is a drawing, although not to scale, showing the measurements of the neutral ground, roadway, and space between the neutral ground where the Donner vehicle made its turning maneuver. This diagram, the measurements made by Mr. Furman Rogers, shows that Kent’s Restaurant is not located directly across from the break in the neutral ground as is evidenced in the police report diagram, but is located a short distance west of the break in the neutral ground.
“All of the evidence shows that the impact on the Donner vehicle was in the-rear and on the Hebert vehicle in the-front. There is a great deal of dispute, however, as to the location on-the highway of the actual point of impact, which is extremely important in-arriving at the proximate cause of this collision.
“Mrs. Donner testified that she came to a complete stop in the break in the neutral ground, and after having observed and seeing no traffice coming, turned to the left, got into the right hand or northern lane, straightened out, and traveled two or three car lengths. This is shown by her testimony at Tr. page 85. The fact that she had straightened out and was moving forward is shown in the testimony of her daughter in law at Tr. page 185, where Mrs. Carol Donner testified that they had traveled about two car lengths and were not going very fast. The speed is estimated at Tr. page 189 to-be between 10 and 15 miles per hour. Her son, Eugene Donner, at Tr. pages 216 and 219 testified that they had completed the turn and were straightened out. Mr. Lamartina testified at Tr. page 199 that they stopped at the intersection, looked and saw nothing coming, just fog, straightened up and traveled a distance of 133 feet towards Raceland. The fact that the Donner vehicle had straightened out is further shown by the testimony of Mr. Cortez-at page 159 of the transcript where he testified that the first thing he noticed-was two tail lights on the rear of the-Donner vehicle.
“Mr. Hebert testified that he was traveling between 45 and 50 miles per hour in the right hand lane at page 9T of the transcript, however it was the testimony of State Trooper Esquível-as shown by his report in the record, that Mr. Hebert was traveling at 55' miles per hour. The speed limit is. shown at this point to be 60 miles per *123 hour. However, this is the lawful speed, and the maximum safe speed under adverse conditions is a question of fact in this case.
■“There is a question that has arisen about the condition of the weather at the time of this accident. Mr. Hebert, at Tr. page 113 testified that there was no fog. Mr. Cortez at Tr. page 165 has testified that the night was clear and that you could see as far as your lights would shine. All of the other testimony and evidence in this case shows positively that it was foggy on the night and at the time of this .accident. Trooper Esquivel at Tr. page 25 testified that it was foggy, and Lieutenant Capaci at Tr. page 75 testified that it was foggy. Mrs. Donner at Tr. page 184 testified that it was foggy. Mr. Lamartina at Tr. page 199 ■described the fog as a 'heavy fog’. Mr. Donner testified that it was foggy, "however Mr. Donner described it as a ■medium type of fog. The weather conditions in the police report shows that the State Troopers checked the "box under weather indicating fog.
'“The Court is of the opinion and convinced that at the time of this accident it was a foggy night, and finds ■same as a fact.
'“The only conclusion that the Court ■can draw about the testimony of plaintiffs Hebert and Cortez that it was a •clear night with no fog is that they were mistaken. It is possible that with -the shock and severe injuries which ■they received that they were not quite •clear about the facts immediately prior -to and at the time of this accident.
“Mr. Cortez, in a statement given -shortly after this accident, has a differ■ent opinion as to the lane in which -he and Mr. Hebert were traveling.
“Mr. Hebert, as the Court has stated, testified that he was traveling between -45 and 50 miles per hour, although he told the troopers at the time of the accident that he was traveling up to 55 miles per hour.
“The Hebert vehicle in the opinion of this Court has to be traveling at a high rate of speed, certainly much more than 40 to 45 miles per hour. The troopers testified that the Donner vehicle was knocked approximately 75 feet and was resting on its back, which could only have been brought about by a most severe blow, the result of excessive speed; this coupled with the face that the Hebert vehicle traveled more than 300 feet across the neutral ground, across the opposite lane, over the shoulder, and into a wooded thicket. There was some question about whether the Hebert vehicle was actually stopped by a tree or not. There is no question but that it did go into a wooded thicket.
“The severity of the impact, along with the distance that the Hebert vehicle traveled after the impact, leads to only one conclusion and that is this vehicle was traveling at a highly excessive rate of speed.
“Trooper Esquivel at Tr. page 56 testified that the safer speed in this fog was between 35 and 40 miles per hour. On his report it is shown that the maximum safe speed is 60 miles per hour. This was clarified by the trooper to mean that the safe speed a person could drive without receiving a ticket for violation of the law was 60 miles per hour.
“Although the court feels that the testimony of Mr. Cortes and Mr. Hebert about their speed and the weather conditions is not worthy of belief, the finding that Mr. Hebert was negligent would be the same if their testimony were correct in all phases. Both of the plaintiffs have testified that the weather was clear and that they were traveling at a moderate rate of speed. However, neither witness saw the Don *124 ner vehicle until they were right upon it and observed the tail lights. Certainly the vehicle was there. The record shows that this is a lighted area with a street light and certain neon signs about the restaurant.
“It is, therefore, the finding of this Court that Arthur A. Hebert was negligent in the operation of his vehicle, and that he was traveling at an excessive rate of speed under the conditions then and there existing, in all probability highly excessive, and that the fact that he did not observe this vehicle until just prior to impact leads this Court to the only conclusion that can be drawn, he was not maintaining the lookout required by law. The fact is that he was traveling at such an excessive rate of speed that when he came upon and observed the tail lights on the rear of the Donner vehicle, that he did not have time to apply his brakes.
“The Court must look to the manner in which Mrs. Donner was operating her vehicle. Mrs. Donner and the three occupants in her vehicle have testified that they came to a complete stop and after having observed traffic and seeing nothing coming, began her turning maneuver. She stated at Tr. page 85 that she had traveled two or three car lengths after having straightened out. Her daughter in law testified at Tr. page 185 that they had gone approximately two car lengths. Her son testified at Tr. page 219 that they had straightened out and had completed the turn. Mr. Lamartina actually measured the distances on two occasions and testified at Tr. page 200 that they had straightened up and had gone 133 feet towards Raceland.
“Mr. Rogers, the investigator for the Aetna Casualty and Surety Company, was on the scene on the morning after this accident. He testified that he observed an area on the shoulder of the road that gave the appearance that a car had been in a wreck in that spot. It was his testimony that this distance was approximately 240 feet from the center of the break in the neutral ground.
“Terry Friedman, a free-lance photographer who was at the scene taking pictures, testified that the vehicle was 130 feet from the intersection.
“The state troopers have marked the point of impact to be approximately two to 5 feet beyond the end of the neutral ground.
“Mr. Rogers chart, which is Donner 23, shows the distance between the neutral grounds to be 78 feet six inches-If the Donner vehicle had come right through the center of the space between the neutral ground, they would have traveled 39 feet three inches, plus-two to five feet, which would be a distance of more than 40 feet they would have traveled. If they had come out of Kent’s Restaurant and' followed an arc and made the turn on the eastern end, they could have traveled 70 to 80 feet. This maneuver appears to be the maneuver made by the Donners. Certainly this is the diagram shown by witness Eugene Donner which is marked Donner 19.
“At first blush it appears that the testimony of the troopers and the other witnesses as to the distance that the Donner vehicle had traveled after completing the turn is in conflict. A close analysis clearly reveals that this-is not the case. It is shown in the testimony that the Donner vehicle was-parked parallel to the highway in front of Kent’s Restaurant, facing east. The-normal and logical maneuver would be to make a turn in an arc or curve as shown by Donner 19, which would have-the Donner vehicle passing on the eastern side of the break in the neutral ground.
*125 “The occupants in the Donner vehicle all testified that the vehicle traveled at least two car lengths after straightening out. This would mean that after completing the turning maneuver their automobile traveled 30 to 45 feet. It would take them an additional 30 to 45 feet in order to complete the turn. Quite naturally a vehicle that is turning and taking off from a stop is traveling very slowly. The speed was estimated by Mrs. Carol Donner at Tr. page 189 to be between 10 and 15 miles per hour.
“Trooper Esquivel testified at Tr. page 25 that the automobile lights in the fog would be visible for a distance of 200 to 300 feet, but you could not make out the automobile, just the lights.
“Assuming that Mr. Hebert was traveling at 50 miles per hour, he was traveling at 74 feet per second; however, it is the belief of this Court that he was traveling at a higher rate of speed in view of the fact that he told the trooper immediately after the accident that he was traveling at 55 miles per hour, coupled with other evidence that that the Court has referred to herein-above.
“It is the belief of this Court that it took Mrs. Donner at the very minimum four seconds after she came to her complete stop at the break in the neutral ground to complete the turn, straighten up and travel two or three car lengths. Assuming that it took four seconds, although it is the belief of this Court that it would have required a longer period of time, and assuming that Mr. Hebert was traveling at 50 miles per hour, although it was the belief of this Court and it is a fact that he was traveling at a higher rate of speed, it was physically impossible for Mrs. Donner to see the Hebert vehicle because she would have been 296 feet away.
“Trooper Esquivel, as the Court has stated, has shown the visibility to be between 200 and 300 feet. It is the belief of this Court and found to be a fact that Mrs. Donner did all the law requires. She stopped at the intersection, looked, and after seeing no-traffic, began her turning maneuver and turned into the proper lane, not the passing lane, but the outer lane for slower moving traffic, and after having straightened up and gone two or three car lengths, she was violently struck from the rear by the oncoming and overtaking vehicle.
“It is the belief of this Court that our jurisprudence requires certain standards of care in the operation of one’s-vehicle which are adjusted and regulated by the conditions existing. If this had been a clear night and the road being straight and unobstructed, Mrs. Donner could have seen for a far distance and should not have made this turn. Of course, under those circumstances Mr. Hebert could have traveled possibly at a higher rate of speed and would not have been negligent. The fact is, and it is found to be a fact by this Court, that Mrs. Donner could not see the oncoming vehicle at the-moment she began her turning maneuver. If Mr. Hebert had adjusted his operation to coincide with the foggy conditions, this accident would not have happened. Had he been traveling within the safe speed at the time, which was set between 35 and 45 miles-per hour, there would have been several other factors which would have come into play. Mrs. Donner would have seen him or would have been legally responsible for not seeing him, and with Mr. Hebert traveling at the greatly reduced rate of speed he could have had time to do something to avoid striking the other vehicle, coupled with the fact that there was another lane or passing lane in which he could have *126 made some effort to go around had he been traveling with the safe speed.
“While the state trooper saw fit to give Mrs. Donner a citation for failing to yield the right of way, this Court feels very strongly that the sole and proximate cause of this accident was not in any way reflected on behalf of Mrs. Donner in the operation of her vehicle, but rests solely and squarely on Arthur A. Hebert.
“If it had been a clear night with no fog, the position of Mrs. Donner may have been different. Possibly this could have something to do with the testimony of plaintiffs Hebert and Cortez that there was no fog with clear visibility as far as one could see.
“For the reasons stated the claims of Arthur A. Hebert are denied. The claim of Lionel J. Cortez is dismissed insofar as it applies to Mrs. Hazel Donner and The Aetna Casualty and Surety Company.
"“The attorney defending Arthur A. Hebert and his insurer, The Travelers Insurance Company, has denied that they were negligent and pleaded in the alternative that Lionel J. Cortez was contributorily negligent. This Court has found as a fact as stated herein-above that Arthur A. Hebert was negligent. There has been no showing in any way that Lionel J. Cortez was contributorily negligent in failing to give certain warnings to Mr. Hebert, the driver of the car.
“The Travelers Insurance Company, the insurer of Mr. Hebert, has pleaded its policy and limits of liability of $5,000.00 for any one person.
“Mr. Cortez was hospitalized in the Ochsner Foundation Hospital from the date of this accident, which was on November 25, 1958, through December 2, 1958, or approximately one week.
“Mr. Cortez has testified at Tr. page 160 that he stayed in bed for approximately two months after returning home, and that he was off from work these two months. It was his testimony that he lost $500.00 a month, or approximately $1,000.00 in wages. “His hospital bill, which is Cortez One, is $347.05.
“Dr. Randolph Page, a neuro-surgeon whose report is Donner One, diagnosed the injuries as cerebral concussion, apparent compound fracture of the supra-orbital ridge and nose, laceration of the tongue, possible implication of the sense of smell with a failure to perceive sweet, salt and sour, and an apparent loss of sense of smell to odors.
“At the trial the court observed a small cut on the left side of the plaintiff’s tongue. Plaintiff, in his own testimony evidenced certain sensory deficits.
“The Court, after a review of the medical reports and an analysis of the testimony of this witness, in light of our jurisprudence, is of the opinion that $4,000.00 is a proper award to Lionel J. Cortez for his injuries, pain and suffering.
“The Court feels that Mr. Cortez has shown that legally he is entitled to his lost earnings for two months, which amounts to $1,000.00.
“The Court is further of the opinion that Mr. Cortez is entitled to his medical expenses and hospitalization, which amounts of $347.05.
“Lionel J. Cortez is therefore entitled to judgment against Arthur A. Hebert and The Travelers Insurance Company in the full sum of $5,347.05, together with interest and costs, with the judgment against the Travelers Insurance Company limited to the amount of its policy which is $5,000.00.
“For the reasons stated hereinabove the claim of Arthur A. Hebert is hereby dismissed, with prejudice, and at his cost.”
*127 Arthur A. Hebert and the Travelers Insurance Company have both appealed. Lionel J. Cortez has neither appealed nor filed answer to the appeal, but asks that the judgment be affirmed.
We have carefully examined the record and find that the Trial Judge’s analysis thereof is eminently correct and that his findings should, therefore, be affirmed.
It appears that pending the appeal, Lionel J. Cortez died and his widow and heirs have been substituted as parties.
Counsel for Hebert’s insurer has raised an issue in this Court, apparently for the first time, based on the following testimony given by Mr. Cortez:
“Q. Did you at that time make the statement that it was your idea that the other party was responsible for the accident and that you could see no way in which Mr. Hebert could have avoided it?
“A. There was no way he could have avoided it.”
Counsel for the Hebert insurer contends that the above testimony completely exonerates Hebert from any negligence and constitutes a judicial confession as defined by LSA-C.C. Article 2291. We do not so construe the testimony. The evidence convinces us, as it did the Trial Judge, that Hebert was traveling at an excessive rate of speed and Cortez’s observation that he could not have avoided the accident was due to the fact of the excess of speed and his failure to see the Donner vehicle.
For the reasons assigned, the judgment appealed from is affirmed.
Judgment affirmed.